FILED
SUPERIOR COURT
OF GUAM

2020 AUG 13 AM 11: 29

CLERK OF COURT

BY:_____

**IN THE SUPERIOR COURT OF GUAM**

| | |
|---|---|
| AES CONSTRUCTION, INC., | Superior Court Case No. <u>CV0798-18</u> |
| Plaintiff, | |
| vs. | **DECISION AND ORDER RE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT** |
| GUAM WANFANG CONSTRUCTION, LTD., and DOES 1 through 10, inclusive, | |
| Defendants. | |

The Court here considers Plaintiff AES Construction, Inc.'s Motion for Summary Judgment and its Cross-Motion for Summary Judgment on the counterclaims asserted by Defendant Guam Wanfang Construction, Ltd. (GWC). The Court GRANTS IN PART and DENIES IN PART both motions.

## I.     UNDISPUTED FACTS[1]

### A.     The Parties' Agreement

The parties entered into a Standard Form of Agreement Between Owner and Design/Builder on March 15, 2015, with GWC as the owner of the project and AES as the design/builder. Decl. John Sherman, Ex. 1 (Dec. 20, 2019).[2] The project involved a residential condominium complex with supporting amenities such as a restaurant, garden, beach sports facility, beach board-walk, and other facilities. Decl. John Sherman, Ex. 1 at 2. The Agreement outlined four phases of work:

---

[1] Simultaneously with this Decision and Order, the Court has issued an Order on AES' evidentiary objections. This "undisputed facts" discussion excludes any evidence for which the Court sustained objections.

[2] Unless otherwise indicated, all citations to the Declaration of John Sherman reference his Declaration filed on December 20, 2019.

a. **Preliminary Concept Design & GLUC Permitting** – Preliminary Concept Design & GLUC Permitting. Prepare design schematics to submit the GLUC Application. Conduct and prepare calculations and position statements for all site utility requirements. Represent and negotiate development terms with the government agencies.

b. **Schematic Design**, Preliminary Concept Design & GLUC Permitting. Prepare design schematics to submit the GLUC Application. Conduct and prepare calculations and position statements for all site utility requirements. Represent and negotiate development terms with the government agencies.

c. **Design Development,** - Design Development (DD Phase) A/E team will prepare Design Development documents consisting of drawings and other documents to fix and describe the size and character of the entire project for approval by the Owner and reviewed by the approving government agencies

d. **Construction Documents** -. From the approved Design Development document, the Construction Documents consist of drawings, specifications, and other documents describing the requirements for construction of the project will be prepared.

Decl. John Sherman, Ex. 1 at 9-10.

GWC agreed to compensate AES in at least five phases. After an initial payment, the first three payments were:

- $500,000 on June 1, 2015 "Upon Obtaining Approved GLUC Permit"

- $880,000 on August 1, 2015, for "Schematic Design Submittal" and "Obtain Army Corps Engineer's Wetland and Government of Guam Sea Shore Permit"

- $800,000 on November 1, 2015 for "Design Development Submittal & Conditional HPR Documentation Approval"

Decl. John Sherman, Ex. 1 at 10. The Agreement required any amendments thereto to be in writing signed by both GWC and AES. Decl. John Sherman, Ex. 1, §§ 1.2.2, 7.4.

### B.    Initial Submissions to GLUC / Geology and Soils Report

GWC submitted a Zone Variance Application to the Guam Land Use Commission (GLUC), which then issued an Amended Notice of Action in May 2016. Decl. John Sherman, Exs. 3, 4. Among other conditions, the Amended Notice of Action required a "soil report and geology engineering report." Decl. John Sherman, Ex. 4 at 5. The parties' Agreement also required AES to "**furnish and pay for the services of geotechnical engineers** . . . when such services are stipulated in this Part 1[3] Agreement or deemed reasonably necessary by the Design/Builder." Decl. John Sherman, Ex. 1 at 5.

Neither party pointed to a provision in the Agreement which stipulated when AES would furnish and pay for the services of geotechnical engineers. GWC believed that AES would obtain the geology report during the Schematic Design (SD) Phase. Decl. Qinggao Lan, ¶ 16.[4] In support, GWC points to AES' December 2016 Status Update to the GLUC. In that document, AES advised it would provide a soil report and geology engineering report during "SD" and that AES was "**In Compliance.** AES contracted soil engineer; testing complete." Decl. Jeffrey Cook, Ex. C (Feb. 18, 2020). GWC further points to AES' May 2017 Status Update to the GLUC which indicated that "SD – Schematic Design (Early Design Phase describing the Basic Components of the Project.) Completed December 2, 2016" and to the March 2018 Status Update indicating "testing complete." Decl. Jeffrey Cook, Exs. F, G. GWC also references AES's proposal, which specified that geotechnical engineering may become necessary as basic design services. Decl. Jeffrey Cook, Ex. D at 3, 4.

---

[3] The Agreement was divided in two parts. Part 1 concerned design while Part 2 dealt with construction. Decl. John Sherman, Ex. 1 at 1.

[4] Lan's Declaration is attached to the Declaration of Jeffrey A. Cook re: Electronic Filing, filed on February 18, 2020.

In contrast, AES contends that the soils report completion occurs at the DD Phase. Supp. Decl. John Sherman, ¶ 11 (Mar. 4, 2020). AES commissioned Geo Engineering & Testing, Inc. ("Geo") for a soil report and made an initial payment to Geo. Supp. Decl. John Sherman, ¶ 6. Geo conducted exploratory soil borings. Supp. Decl. John Sherman, ¶ 7. According to AES, a soil report is an essential design requirement "needed to complete the design of a building. The Project is located on an alluvial soil near the mouth of Pago River." Supp. Decl. John Sherman, ¶ 5. AES gathered information on the planned foundation type using Island Geological reports by US Geological Surveys and the University of Guam, prior subsoil information, consultations with Geo, and confirmation of the depth of the soil during exploratory data soil collection drillings. Supp. Decl. John Sherman, ¶ 8. According to AES, while preparing the SD package for GWC, "AES determined it had sufficient information to submit the total design to the Owner. While the final soils report is an essential document, the continuous consultation we had with the geo-technical engineer at [Geo] provided us enough information to submit the SD package" to GWC. Supp. Decl. John Sherman, ¶ 10. "The test data contained in the final soils report would have been ultimately used during the subsequent design development phase . . . and for the design of the storm water management plan as required in section 2(a) of the Amended Notice of Action but that was not necessary to submit and finalize during the SD package." Supp. Decl. John Sherman, ¶ 10.

It is undisputed that AES terminated its services before reaching the DD Phase. AES believes that because its services terminated at the SD phase, and the design of a stormwater management plan occurs at the next phase (DD), obtaining the completed soils report became unnecessary. Supp. Decl. John Sherman, ¶ 11. AES has also advised that the "soils report was

not completed due to non-payment of AES fees by Defendant and AES termination of its services to the Project." Decl. John Sherman, ¶ 7 (Nov. 6, 2019).

GWC did not receive a soil report and was not advised by AES that it did not obtain the report. Decl. Qinggao Lan, ¶¶ 8, 17.

### C.    Marina and Boat Launch Facility

GWC's initial project sketches included a commercial marina and boat launch facility. Decl. John Sherman, Ex. 2. AES claims that at some point, GWC decided not to pursue the marina due to public opposition to the zone variances, budget limitations, a requirement to dedicate the land to the Guam Fire Department, and AES's designs which avoided encroachment on the wetlands or seashore. Decl. John Sherman, ¶ 10. AES has not provided any written evidence which indicates that GWC adopted these reasons, however.

In September 2015, months after execution of the Agreement, AES prepared a supplemental scope of work. That scope of work explicitly excluded marina construction. Decl. Jeffrey Cook, Ex. H. In October 2016, AES and GWC representatives met in China for AES' presentation of its schematic design plans. AES' plans did not include a marina or boat launch facility. Supp. Decl. James Fang, ¶ 5 (Mar. 4, 2020).

In May 2017, AES submitted a Status Update to the GLUC. The Status Update noted that the commercial operations of a marina were no longer part of the development. Decl. John Sherman, Ex. 9 at 5.[5] AES contends that eliminating a marina obviated the need for any seashore permits. *See also* Supp. Decl. James Fang, ¶ .

---

[5] AES also provided excerpts of an appraisal dated January 2017 which do not mention a marina. That appraisal appears to be submitted directly to Fang, so it is unclear whether anyone other than Fang knew of the appraisal. Supp. Decl. James Fang, Ex. 1 (Mar. 4, 2020).

AES claims that GWC—through Fang—advised it would no longer pursue a marina and boat launch facility. Supp. Decl. John Sherman, ¶ 22. Fang acted as the General Manager of GWC and GWC's sole representative on Guam. Supp. Decl. James Fang ¶ 3. Fang's authority included executing an Addendum to the Agreement, signing a $475,000 check issued to AES, and drafting an authorization letter notifying the Government of Guam that AES is authorized to represent GWC before the GLUC for this project. Decl. John Sherman, Exs. 1 at 000014, 2 at 000089, and 5. According to AES, "All the reasons for not pursuing the marina and boat launch facility was communicated to Mr. Fang which resulted in his oral permission to submit the Project Status Update with the GLUC on May 2, 2017, advising GLUC that GWC was no longer pursuing the marina and boat launch facility development . . . and at no time did Mr. Fang ever advise AES that GWC had changed its position on this issue." Supp. Decl. John Sherman, ¶ 22.

On the other hand, Qinggao Lan, President of GWC, claims that he did not receive direct information about the elimination of the marina and boat launch facility. Decl. Qinggao Lan, ¶¶ 7, 14. "Fang did not have authority to make such a unilateral change in the project without approval of high ups in the company including me." Decl. Qinggao Lan, ¶ 7. GWC claims that it never informed AES that it wanted to forego the marina and boat launch facility. Decl. Qinggao Lan, ¶¶ 4, 12. Had it been so advised, it "would have requested a revision of the contract to remove the cost for obtaining the permits." Decl. Qinggao Lan, ¶ 13.

Instead, according to Lan, AES informed GWC that the Government of Guam would fund $1,000,000 for a boat launch facility. "Acquiring the two permits are time and money consuming processes. If GWC had given up seeking these two permits, the company would have definitely asked AES to deduct the relevant fees from the design fees set out in the

contract." Decl. Qinggao Lan, ¶ 5. AES never provided a change order to eliminate costs related to the permits. Decl. Qinggao Lan, ¶ 13.

Finally, according to Lan, GWC never accepted the quality of the completed SD drawings. Decl. Qinggao Lan, ¶ 6.

### D.    Foundation Issues

GWC claims that AES tendered no written information to him about pilings and foundation, including at their meetings in August 2016 in Guam and in October 2016 in China. Decl. Qinggao Lan, ¶¶ 8, 11. Also, "AES never provided GWC with any documentation regarding the issue of increased cost for the project due to the depth of pilings and number of pilings that would be required based on the proposed design of the building" or with foundations drawings showing the depth and number of the pilings. Decl. Qinggao Lan, ¶¶ 9, 10. This despite AES agreeing that it would provide updated costs. Decl. Qinggao Lan, ¶ 10. The Agreement tasks AES with providing revisions to the budget. Decl. John Sherman, Ex. 1 § 1.4.2.

### E.    Payments

AES claims that it received $774,880 in payments between May 2016 and January 2018. Decl. John Sherman, ¶¶ 13, 24. Also, in January 2018, Fang advised AES that substantial additional payments were forthcoming, and AES should continue to work on the project. Decl. John Sherman, ¶ 25. On March 30, 2018, AES advised the Department of Land Management that it no longer represented GWC. Decl. Jeffrey Cook, Ex. E; Decl. John Sherman, ¶ 32. GWC construes AES's letter to DLM as AES's termination of services.

AES claims damages of $757,927.63, not inclusive of prejudgment interest. Decl. John Sherman, ¶¶ 34, 35.

### F.    Mechanic's Lien

AES recorded a Mechanic's Lien on May 31, 2018. Decl. John Sherman, Ex. 18. The Lien referenced AES' claim for $757,927.93 plus interest against GWC.

Fang is GWC's designated agent for service of process. Decl. J. Bronze, ¶ 16, Exs. 12, Art. 8, 13 (Dec. 20, 2019). AES mailed the Notice of Lien to GWC's mailing addresses in Guam and China and served Fang personally at his residence. Decl. J. Bronze, Exs. 7-9. AES also received a return receipt. Decl. J. Bronze, Ex. 7.

### G.    Complaint/Service

AES filed a Complaint for Damages and Foreclosure of Mechanic's Lien against GWC. Compl. (Aug. 20, 2018). The Complaint alleges claims for breach of contract, quantum meruit and quantum valebant, and foreclosure of mechanic's lien. AES personally served the Complaint on Fang. Decl. Serv. (Sept. 5, 2018).

GWC's Answer listed seven affirmative defenses: AES failed to file and protect its lien; AES failed to allege viable claims; estoppel; laches; AES failed to obtain an approved height variance; insufficient service of process of the Complaint; and insufficient service of the Mechanic's lien. GWC also raises counterclaims for breach of contract. Answer and Countercl. (Sept. 20, 2018).

## II.    LAW AND DISCUSSION

### A.    Summary Judgment Standard

A court may grant summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." GRCP 56(c). A genuine issue of fact exists when "there is 'sufficient evidence' which establishes a factual dispute requiring resolution by a fact-finder." *Iizuka Corp. v. Kawasho Int'l (Guam), Inc.*, 1997 Guam 10 ¶ 7 (citing *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit…Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *Iizuka Corp.*, 1997 Guam 10 ¶ 7. "If the movant can demonstrate that there are no genuine issues of material fact, the non-movant cannot merely rely on allegations contained in the complaint, but must produce at least some significant probative evidence tending to support the complaint." *Edwards v. Pacific Fin. Corp.*, 2000 Guam 27 ¶ 7. Finally, the "Court must view the evidence and draw inferences in the light most favorable to the non-movant." *Id.*

### B.   AES' Breach of Contract Claim

#### 1.   GWC may raise the issue of the conditions precedent even if it did not raise them as affirmative defenses.

AES claims that GWC has waived the defense that AES failed to satisfy certain conditions precedent. Specifically, AES claims that GWC failed to assert an affirmative defense contending that AES did not obtain the wetland and seashore permits. Reply at 12 (Mar. 12, 2020). Although Guam Rule of Civil Procedure 8(c) requires any matter constituting an avoidance to be raised as an affirmative defense, the waiver of such a position depends on fairness. As explained in *Citizens Security Bank v. Bidaure*, 1997 Guam 3, the court must examine whether the opposing party suffered prejudice.

GWC's Answer and Counterclaim allege that AES failed to obtain necessary permits. Such a counterclaim placed AES on notice of GWC's position early on in this litigation. Thus, while GWC did not raise any failure of conditions precedent as affirmative defenses, AES has not suffered prejudice. The Court therefore will proceed to consider GWC's defense.

### 2.    Rule 9(c) does not bar GWC from raising arguments regarding conditions precedent.

AES further asks to bar GWC from arguing that AES failed to satisfy a condition precedent because it failed to plead such failure with particularity under Guam Rule of Civil Procedure 9(c). According to AES, "AES has been prejudiced by failing to explore further through discovery the facts relating to GWC's current position that it never intended not to pursue the marina and boat launch facility. Thus, all arguments relating to the failure to obtain the Permits by AES cannot be considered by the Court." Reply at 14.

While it appears correct that GWC's Answer (and its Counterclaim) did not particularly address AES' failure to obtain permits, AES again has not been prejudiced. For example, AES' Motion points to the deposition of GWC's Rule 30(b)(6) representative, during which AES inquired whether a marina or boat launch facility was mentioned in two separate documents. Supp. Decl. Jacques Bronze, Ex. 20. AES had enough notice of GWC's position to pose these questions.

Courts also show some leniency on a Rule 9(c) deficiency as consistent with Rule 15's liberal pleading standard. *Odyssey Reinsurance Co. v. Cal-Regent Ins. Servs. Corp.*, 123 F. Supp. 3d 343, 353 (D. Conn. 2015) (citing federal cases). "Where defendants failed to deny with particularity in their pleadings the performance of conditions precedent, and raised particular failures of performance for the first time at summary judgment, courts in this Circuit have

allowed defendants to amend their pleadings." *Id.* The Court finds that AES would not be unduly prejudiced in allowing GWC to present this defense and permits leave of court to amend its Answer.

### 3. Whether there are genuine issues of material fact concerning GWC's breach of contract.

It is undisputed that the Agreement terminated prior to the fulfillment of all terms. AES asks the Court to find that there is no genuine issue of material fact that GWC breached the contract by failing to pay the amounts owed to AES. GWC responds by pointing to three alleged breaches by AES:  failure to obtain a geotechnical report; failure to design a marina and boat launch facility, and relatedly, failure to obtain permits; and failure to provide information and a revised budget about foundational issues.

### a. The Geotechnical/Soils Report

GWC claims that there is an issue of fact regarding whether the SD phase was completed absent a soils report. AES responds that by submitting the SD plans, it satisfied the conditions for payment. AES further argues that the SD phase did not require a completed soils report and also that there was no requirement for a soils report prior to payment.

In the plain language of the contract, the SD phase's scope of work required AES to "prepare design schematics to submit the GLUC Application." Decl. John Sherman, Ex. A at 9. Payment for the SD phase was contingent upon "Schematic Design *Submittal*." Decl. John Sherman, Ex. A at 9-10 (emphasis added). GWC does not dispute that AES presented its schematic designs to GWC in China in October 2016, though it complains about the quality of the product, implying that GWC did not consider AES's SD phase work to be completed. Decl. Jacques Bronze, Ex. 5 at 33 (Depo. Tr. Longzhi Sun); Decl. Qinggao Lan, ¶ 6.

The Agreement does not define "submit" nor does it provide a mechanism whereby GWC approves of what AES presents in the SD Phase prior to payment. In a business context, the term "submit" means "to formally send a document, plan, etc. to a person or group in authority so that they can make a decision about it." Cambridge Dictionary, https://dictionary. cambridge.org/dictionary/english/submit (last visited Aug. 5, 2020). In other words, "to submit" is not the same as "to complete" nor does it require approval. Given the definition of "submit," the lack of any approval mechanism by GWC as a condition for payment, and the undisputed fact that AES presented its schematic designs to GWC, it appears that AES satisfied the contractual condition of submitting its schematic designs in the SD phase.

GWC further contends that the SD Phase was not complete absent a soils report conducted by geotechnical engineers. Under the Agreement, AES was responsible to **"furnish and pay for the services of geotechnical engineers** . . . when such services are stipulated in this Part 1[6] Agreement or deemed reasonably necessary by the Design/Builder." Decl. John Sherman, Ex. 1 § 2.1.5. Neither party has shown that "such services" were stipulated elsewhere in the Agreement, thus, AES possessed the discretion to determine when the services of geotechnical engineers were reasonably necessary. AES explains that the soils report would have been used during the DD phase for the design of a stormwater management plan. GWC counters that AES informed the GLUC on at least two occasions that the soils report was completed. Decl. Jeffrey Cook, Exs. C,[7] G. However, those references do not specifically indicate the soils report as being part of the SD phase work.

---

[6] The Agreement was divided in two parts. Part 1 concerned design while Part 2 dealt with construction. Decl. John Sherman, Ex. 1 at 1.

[7] The Court acknowledges that there is a separate line item in the same Status Report that says a "comprehensive soil analysis" was **"Ongoing** . . . awaiting report" but that line item appears to pertain to storm water issues. *See* Decl. Jeffrey Cook, Ex.C.

In conclusion, there is no genuine issue of material fact that AES submitted its schematic design. It is a further undisputed fact that the soils report, which was determined by AES to be necessary for a later phase of the project, did not preclude GWC from paying AES for work performed in the SD phase.

### b.    Marina and Boat Launch Facility/Wetland and Seashore Permits

In its second counterargument to AES' Motion for Summary Judgment, GWC claims that AES did not complete the permitting portion of its SD phase responsibilities—specifically to "Obtain Army Corps Engineer's Wetland and Government of Guam Sea Shore Permit"— separate requirements from submitting the schematic designs. Decl. John Sherman, Ex. A, § 1.2.3. AES claims that GWC waived the permitting requirements through its agent, Fang, who advised AES that GWC decided not to build a marina.

The initial project sketches include a marina. The Agreement does not contain a specific reference to a "marina" or boat launch facility, though AES' earlier proposal indicated that it would design a "potential marina and boat launch facilities." Decl. Jeffrey Cook Ex. D. Months after the Agreement, AES prepared a supplemental scope of work which excluded a marina—however there is no evidence showing that this change was approved by GWC. In 2016, AES presented design plans to GWC which did not include a marina. In May 2017, AES' Status Update to the GLUC also omitted mention of these facilities.

Despite the indications that AES left out the marina from its designs, AES presents nothing in writing from GWC that approves eliminating the marina from the design or consenting to eliminating the requirement that AES pursue the permits. The only evidence stems from AES' claim—supported by Fang—that GWC agreed to eliminate the marina and boat

launch facility. AES claims that Fang orally approved the change; GWC counters that Fang lacked the authority to make this change. Also, AES claims that eliminating these facilities obviated the need to obtain a seashore and wetland permit as required under the Agreement; GWC counters that the contract price should have reduced accordingly.

Thus, the question is whether there is a genuine issue of material fact as to whether GWC consented to eliminating the contractual requirement for the permits, and thus, the design of the marina; and if not, whether Fang had the ability to bind GWC with an oral approval. First, obtaining the permits is an explicit condition of the contract; if the contract scope was to change, the changes had to be in writing. Decl. John Sherman, Ex. 1, §§ 1.2.2, 7.4. AES has pointed to caselaw that indicates that if a contract provides that a writing is necessary to amend it, the parties—by their conduct—may waive such provision. *See Biren v. Equal. Emergency Med. Group*, 125 Cal. Rptr. 2d 325, 335 (Cal. App. 2002).[8] In *Biren*, the court found a waiver where the parties engaged in oral waivers in the past. Therefore, to find a waiver, courts look to the parties' course of conduct. The court in *Gilmarten Bros., Inc. v. Kern*, 916 S.W.2d 324, 329 (Mo. Ct. App. 1995) agrees that the parties' informal communications, actions, and dealings inferred waiver of literal compliance with the provision that changes be in writing. Courts also suggest that the preeminent question is whether the parties possessed the intent to waive a contractual requirement to place changes in writing and that the waiver be clear and unequivocal. *Douglas v. Benson*, 439 A.2d 779, 783 (Pa. Super. Ct. 1982); *336 Green Rd. Co., Ltd. v. Specialized Component Sales Co., Inc.*, 69 NE.3d 1083, 1092 (Ohio Ct. App. 2016). Ultimately,

---

[8] AES also cited *Epic Med. Mgmt., LLC v. Paquette*, 198 Cal. Rptr. 3d 28, 35 n.5 (Cal. App. 2015), however, this case did not have a substantive discussion on the principal of waiving a contractual provision that changes must be in writing.

whether the parties' conduct constitutes a waiver is a question of fact. *Richard F. Kline, Inc. v.*

*Shook Excavating & Hauling, Inc.*, 885 A.2d 381, 390 (Ct. Special App. Md. 2005).

AES has not pointed to or discussed a course of conduct which amounted to GWC's

waiver of the contractual provision to place modifications in writing. In other words, there is no

information about whether GWC orally or informally waived other terms or conditions. What

AES does point to is the number of occasions that GWC would have known that the marina was

no longer part of the project. However, the Court is not persuaded that any of those examples

clearly and unequivocally show that GWC consented to either waiving the

modifications-in-writing provision or eliminating the marina. For example, AES' supplemental

scope of work (Decl. Jeffrey Cook Ex. H) excludes the marina—but it is unclear what this

document is, if it is a final document as opposed to a draft,[9] if it amounted to a modification of

the contract, and whether GWC accepted it. AES also points to having presented the SD designs

to GWC in China in October 2016, and AES' submission to the GLUC in May 2017—neither of

which included the marina. However, AES has not offered any evidence that GWC (other than

through Fang) consented to the SD designs, or to the GLUC submission, or to allowing AES to

drop a portion of its contractually mandated work. Finally, AES lists various reasons GWC did

not proceed with the marina—such as public opposition and budgeting reasons—but fails to

offer evidence that GWC in fact was motivated by any of those reasons. So aside from any oral

consent by Fang, discussed below, the Court does not find that AES has presented enough

evidence to convince the Court that GWC consented to waiving the permit requirements.

---

[9] There are two incomplete lists on this document, suggesting it is unfinished.

Moving on to the oral consent from Fang, AES contends that it was entitled to rely on Fang's apparent authority to authorize the elimination of the marina. According to AES, "All the reasons for not pursuing the marina and boat launch facility was communicated to Mr. Fang which resulted in his oral permission to submit the Project Status Update with the GLUC on May 2, 2017, advising GLUC that GWC was no longer pursuing the marina and boat launch facility development." Supp. Decl. John Sherman, ¶ 22.

In Guam, an agent has apparent, or ostensible, authority when a principal intentionally, or by want or ordinary care, causes or allows a third person to to believe the agent to possess. 18 GCA § 20214. This contrasts with an agent's actual authority, which occurs when a principal intentionally or by wants or ordinary care, allows the agent to believe he possesses certain authority. 18 GCA § 20213. "The significance of finding an agency relationship is that the agent's acts and representations to a third party are imputed" to the principal. *Leong v. Deng*, 2002 Guam 2 ¶ 12. Whether agency exists is a question of fact. *Id.* ¶ 10. However, as AES points out, if a principal rests on legal conclusions of lack of actual authority without setting forth specific facts to dispute apparent authority, summary judgment may be proper in favor of the third party. *Lockwood v. Wolf Corp.*, 626 F.2d 603, 609 (9th Cir. 1980).

In this case, GWC disputes Fang's actual authority, but has not presented facts to dispute AES' claims of Fang's apparent authority to instruct AES to cease work on the marina. The evidence indicates that GWC tasked Fang with communicating with AES, executing at least one large payment to AES, signing an Addendum to the Agreement, and representing to the GLUC that AES represented GWC. Based on this evidence, there appears to be no genuine issue of material fact that Fang had the apparent authority to direct AES on major project decisions.

But that is a separate question from whether Fang had the apparent authority to waive the requirement that all changes be in writing. GWC raises a valid point that if it intended to eliminate the marina, it would have sought to reduce the overall contract price. AES fails to respond to this point and continues to seek the full contractual amount even though it did not complete the permitting items for which it would have been paid.

Given the lack of any evidence of an informal or oral process of communicating instructions from GWC to AES, or any evidence that prior oral changes were consented to by both parties, there remains issues of fact whether Fang had the apparent authority to eliminate and thereby modify that all changes to the Agreement be in writing. Whether the change also amounts to a modification of the contract price remains a factual issue. These matters must still be determined by the trier of fact.

### c.    *The Revisions to the Budget*

GWC also claims that AES failed to provide revised budget estimates for the project. According to GWC, AES may have withheld the information because it would have caused GWC to rethink the project. Opp'n. at 10. AES responds that it was not contractually required to provide budget estimates as a condition to being paid for the SD phase work. It also points to GWC's Business Plan, though it's unclear whether AES references the Business Plan as evidence that it did not need to do financial revisions or because GWC already did revisions.

In any event, this particular issue is not well-developed by either party. If the core issue is whether AES was required to provide certain budget revisions, the Agreement seems to support that. According to the Agreement, AES shall make revisions to the budget when such revisions are necessary due to adjustments. Decl. John Sherman, Ex. A, § 1.4.2. If AES's work

indicated new information regarding the depth and number of pilings, then there remain issues of fact as to whether AES needed to adjust the budget prior to being paid for the SD phase work.

### C.   Mechanic's Lien Issues

AES seeks summary judgment on the timeliness and standing of its Mechanic's Lien and on GWC's Seventh Affirmative Defense challenging the service of the Mechanic's Lien notice.

### 1.   AES's Standing

AES claims it is a qualified person under 7 GCA § 3301 to file a Mechanic' Lien as it bestowed skills or other necessary services. The record supports that AES furnished such work for GWC. GWC does not introduce any facts to dispute AES' standing to file a Mechanic's Lien. For that reason, the Court determines as a matter of law that AES has standing.

### 2.   AES's Proper Service of its Mechanic's Lien on GWC (GWC's 7th Affirmative Defense)

In its Seventh Affirmative Defense, GWC claims that service of the Mechanic's Lien was defective. In its Motion, AES provided evidence that it served the Mechanic's Lien both by mail and personally upon GWC's designated resident agent for service of process, which complies with 7 GCA § 33106. Although GWC alleges that service of process was insufficient, GWC failed to furnish any evidence that disputes AES' efforts to properly serve the Mechanic's Lien.

As there are no facts in dispute on this issue, the Court determines as a matter of law that AES properly served its Mechanic's Lien on GWC.

### 3.   The Timeliness of the Mechanic's Lien (GWC's 1st Affirmative Defense)

On the timeliness of the Mechanic's Lien, AES claims it filed its claim under the 120-day deadline. 7 GCA § 33104(a)(1). First, it ceased work on March 27, 2018. Second, it filed its

Claim of Mechanic's Lien with the Department of Land Management on May 31, 2018, and mailed GWC a copy to its Guam address on June 1, 2018, which was received ten days later.

However, GWC's First Affirmative Defense asserts that "AES failed and neglected to file and protect its lien within the time required under Guam law. Consequently, AES has forfeited any lien rights or claims that it might have in or to GWC's real property." Answer and Countercl. at 2. But GWC has not provided any evidence to buttress its position. In discovery, AES asked GWC to identify all facts in support of this affirmative defense. Decl. Jacques Bronze, Ex. 10. In response, GWC provided the conclusory statement that "Plaintiff did not work on the project pursuant to the contract within 258 days of filing his mechanic's lien." Decl. Jacques Bronze, Ex. 11 at 4.

AES now moves for summary judgment on the timeliness issue and on GWC's First Affirmative Defense. GWC has not come forth with evidence to contradict AES's chronology, nor did it argue that its First Affirmative Defense should stand. For those reasons, summary judgment is warranted in favor of AES on GWC's First Affirmative Defense.

### D.    2ⁿᵈ Affirmative Defense

GWC's Second Affirmative Defense claims that "AES has failed to allege[] facts sufficient to constitute a viable legal claim or cause of action against GWC on any of the causes of action set forth in the Complaint." Answer and Countercl. at 2. Under Guam Rule of Civil Procedure 12(b)(6), if a party contends that a pleading fails to state a claim for relief, it must file such motion before any further pleading. By pleading and answering the Complaint, GWC waived its position that AES failed to state a viable claim for relief. Also, GWC fails to oppose

AES's motion for summary judgment on this point. Summary judgment is thus warranted in favor of AES on the Second Affirmative Defense.

### E.    3rd Affirmative Defense

GWC's Third Affirmative Defense asserts that AES is estopped from asserting its claims or seeking damages. Answer and Countercl. at 2. "Equitable estoppel is defined as the doctrine by which a person may be precluded by his act or conduct, or silence when it is his duty to speak, from asserting a right which he would have otherwise have had." *Mobil Oil Guam, Inc. v. Young Ha Lee*, 2004 Guam 9 ¶ 24.

GWC's Opposition fails to address or introduce facts in support of its Third Affirmative Defense asserting estoppel. On that basis, summary judgment is warranted in favor of AES.

### F.    4th Affirmative Defense

GWC claims that AES's claims are barred by laches and other equitable time limitations. Answer and Countercl. at 2. As already discussed, GWC's Opposition makes no substantive arguments regarding the timeliness of AES' claims. Having failed to raise a genuine issue of material fact on these points, summary judgment is warranted in favor of AES on laches.

### G.    5th Affirmative Defense

GWC's Fifth Affirmative Defense states that "AES breached the contract by failing to obtain an approved height variance for the project as required by the contract between AES and GWC." Answer and Countercl. at 2. GWC's Opposition addresses AES's alleged failure to obtain certain permits, such as the seashore clearance permit and wetland permit. However, nowhere in its Opposition does GWC take a position as to the AES' alleged failure to obtain an approved height variance. On the other hand, AES produces facts that show that the Agreement

did not specify any specific height for the project and also that the GLUC approved a height variance. There being no facts presented in support of GWC's Fifth Affirmative Defense, summary judgment is warranted in favor of AES.

## H.    6th Affirmative Defense – Insufficient Service of Process

In its Sixth Affirmative Defense, GWC claims that AES failed to effectuate service of process of the Complaint. AES first correctly points out that Rule 12 requires a party raising a defense of insufficient service of process must do so by motion prior to pleading. GRCP 12(b)(5). Since GWC did not raise this issue by Motion, it is deemed to have waived it.

Regardless, AES has demonstrated to the Court that it has properly effectuated service. It served GWC's designated resident agent for service of process, Fang. Moreover, there has been nothing filed with the Department of Revenue and Taxation indicating revocation of this designation. In addition, GWC does not offer any response to this argument that service of process was proper. For that reason, the Court finds proper service is undisputed as a matter of law.

## I.    GWC's Counterclaim

GWC's counterclaim against AES claims that AES made mistakes in the design and failed to comply with the conditions of the Agreement. As a result, the project was delayed, GWC lost financing, and GLUC revoked GWC's conditionally approved variance. Answer and Countercl. at 5.

AES moves for summary judgment on the Counterclaim and asserts that GWC has demonstrated neither damages nor proximate cause. Damages is one of the elements in a breach of contract action. *Gov't of Guam v. Kim*, 2015 Guam 15 ¶ 60. Damages are not recoverable for

a breach of contract unless they are clearly ascertainable in both their nature and origin. 20 GCA § 2202. Also, causation is an essential element of damages in a breach of contract action. *See Nat. Market Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

In a summary judgment proceeding, the party seeking damages must provide evidence of such. However, even if damages cannot be proved with reasonable certainty, or if they cannot prove causation, a party may still be entitled to nominal damages for the breach of contract. Rest. (Second) of Contracts § 346 1981 cmt (b). A "plaintiff is entitled to recover nominal damages for the breach of a contract, despite inability to show that actual damage was inflicted upon him... since the defendant's failure to perform a contractual duty is, in itself, a legal wrong that is fully distinct from the actual damages." *Sweet v. Johnson*, 337 P.2d 499, 500 (Cal. App. 2d 1959).

Here, GWC has failed to establish with reasonable certainty any amount of damages sought. GWC's Opposition does not address the issue of damages at all. However, GWC has furnished sufficient material facts to support its counterclaim that AES breached the Agreement and may still recover nominal damages. Since there is no genuine issue of material fact as to damages, however, summary judgment is warranted in AES' favor on the actual damages element of the counterclaim.

## III.    CONCLUSION

The Court GRANTS summary judgment in favor of AES on the following issues:

1. There is no genuine issue of material fact that AES satisfied the condition of submitting the schematic designs.

2. There is no genuine issue of material fact that the absence of a soils report did not affect

AES from receiving payment for work on the SD phase.

3. There is no genuine issue of material fact that AES properly and timely served its Mechanic's Lien and has standing to record a lien.

4. There is no genuine issue of material fact that Fang had the apparent authority to waive the requirement that AES obtain the seashore and wetland permit.

5. All affirmative defenses.

6. GWC's request for actual damages in its counterclaim for breach of contract.

The Court DENIES summary judgment on the following issues, which must be determined by the trier of fact along with any other issue not addressed by the summary judgment motion:

1. Whether GWC waived the contractual requirement that all changes be in writing.

2. Whether AES was required to provide budget estimates prior to being paid for the SD phase work.

3. GWC's counterclaim for breach of contract, except for actual damages.

SO ORDERED this 13th day of August 2020.

_____
HON. ELYZE M. IRIARTE
Judge, Superior Court of Guam

Appearing Attorneys:
Jacques G. Bronze, Esq., Law Offices of Jacques G. Bronze, P.C., for Plaintiff AES Construction, Inc.
Jeffrey A. Cook, Esq., Law Offices of Cunliffe & Cook, for Defendant Wanfang Construction, Inc.